**UNITED STATES DISTRICT COURT**
<u>**WESTERN DISTRICT OF WISCONSIN**</u>

JOANNA BAIRD and LINDA GREGERSEN,
on behalf of themselves and all those
similarly situated,

Case No. ___26-cv-374___

                    Plaintiffs,

    v.

**CIVIL COMPLAINT, CLASS ACTION
and JURY DEMAND**

MELISSA AGARD, in her official capacity
as executive to Dane County; KALVIN D.
BARRETT, in his individual and official
capacities; DOES 1–25, being all law enforcement
and "contractor" security sued in their individual
capacities; RIDGLAN FARMS, INC. and
JAMES A. BURNS,

               Defendants.

_____

Plaintiffs JOANNA BAIRD and LINDA DEE GREGERSEN, by and through counsel, Susan
Chana Lask, Esq., allege as follows:

## NATURE OF THE ACTION

1.  Ridglan Farms' business depends on the suffering of innocent beagles bred and sold for
    painful experiments, including injecting them with chemical toxins. It is therefore no
    surprise that Ridglan did not hesitate to inflict the same pain and suffering on peaceful
    rescuers when Ridglan responded with chemical agents, rubber bullets, and manure filled
    toxic trenches - choosing violence, contamination, and terror to protect its profits rooted in
    suffering.

2.  It is as disturbing that Dane County allows the animal abuse and assisted Ridglan with
    chemical and biological attacks on humans as well.

3.  This civil rights and tort class action arises from a planned campaign by Defendants of
    excessive force against nonviolent animal rescue demonstrators at Ridglan Farms in Dane
    County, Wisconsin, on April 18, 2026, including Defendants using chemical agents, impact
    munitions, and manure filled trenches to contaminate rescuers.

1

4.    Plaintiffs seek damages and other relief under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments, and under Wisconsin law for assault, battery by hazardous biological contact, public nuisance, among other causes of action.

### JURISDICTION AND VENUE

5.    Jurisdiction exists over the federal claims under 28 U.S.C. §§ 1331 and 1343 because this action arises under 42 U.S.C. § 1983 and the United States Constitution.

7.    Supplemental jurisdiction exists over the state law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy.

8.    Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred in Dane County, which is in the Western District of Wisconsin.

### PARTIES

10.    Plaintiffs Joanna Baird and Linda Gregersen are adult citizens of Utah who attended a rescue event on April 18, 2026 at Ridglan Farms and were attacked by Defendants.

11.    Defendant Melissa Agard is sued in her official capacity as the executive of the board of Dane County, a municipal entity organized under Wisconsin law, in which Agard and her board members are responsible for the policies, practices, customs, training, supervision, and discipline of the Dane County Sheriff's Office.

12.    Defendant Kalvin D. Barrett is the Sheriff of Dane County who, at all relevant times, acted under color of state law, and is sued in his individual capacity.

13.    Defendant Does 1–25 are deputies, supervisors, tactical officers, and other law enforcement personnel and persons dressed in black identified as "contractor" who participated in, ordered, authorized, supervised, or failed to prevent the unconstitutional use of force against Plaintiffs. Their identities are presently unknown.

14.    Defendant Ridglan Farms, Inc. ("Ridglan") is a Wisconsin corporation with its principal office at 10489 W. Blue Mounds Road, Blue Mounds, Wisconsin 53517.

15.    Defendant James A. Burns, DVM is the president, co-owner, and registered agent of Ridglan, residing in Dane County, and is a veterinarian licensed by the State of Wisconsin.

2

**FACTUAL ALLEGATIONS**

**Ridglan Farms Animal Abuse**

16. Since September 7, 1966, Ridglan Farms operates a beagle breeding facility to sell dogs to bio-medical research laboratories for experiments, and Ridglan itself conducts experiments on the dogs.

17. Ridglan breeds beagles because their docile nature makes them easy to exploit: they are gentle, defenseless dogs who do not fight back even when hurt.

18. For years, media investigations and courts confirm that Ridglan is unfit to care for the beagles it keeps caged inside its warehouse, kept under fluorescent lights without ever allowing them outside for sun or exercise. A Fox6 news investigation found that Ridglan dogs over 300 Ridglan dogs died from rancid food and contaminated water and over 500 died from parvovirus outbreaks at Ridglan. *See* https://www.fox6now.com/news/wisconsin-puppy-mill-beagles-suffer-human-research

19. In September, 2024, the Department of Agriculture, Trade and Consumer Protection (DATCP) in Wisconsin, the state agency that licenses Ridglan to breed dogs, asked Ridglan to agree to 311 violations of state animal welfare regulations and pay a $55,148.50 fine. Ridglan refused to pay the fine despite findings of Ridglan failing to handle a dogs in a humane manner, failing to provide a daily mobility and body check of dogs, puncture wounds and cysts on dogs paws, and having untrained persons perform over 300 cherry-eye surgeries without anesthesia or post-operative care. **Exhibit A.**

20. In January 9, 2025, Dane County Circuit Judge Lanford found probable cause on numerous misdemeanor and felony counts of animal cruelty against Ridglan involving mutilating dogs' eyes and vocal cords without anesthesia, and keeping dogs in small confined spaces to the point they spin and have violent fights where one dog was killed by being devoured by other dogs right through its chest and body cavity and the dogs are never taken outside, feces and urine remains stagnant in the cages and floors without proper sanitation and creating a health risk for the dogs and improper ventilation creating sickness of the dogs.

21. Judge Lanford ordered a special prosecutor in Dane County to prosecute Ridglan, yet that prosecutor merely agreed with Ridglan to relinquish its state breeding license by July 2026 while allowing it to continue to experiment on some 2,000 beagles at its facility. **Exhibit B.**

3

22. In September 2025, an emergency suspension of Ridglan's veterinarian license occurred for allowing unqualified staff to perform surgeries on the Ridglan dogs and for foul odors and poor conditions at the facility. That investigation is ongoing.

23. Despite those findings, Ridglan's website falsely advertises that it is "committed to the highest standards of health and quality" and they "raise high quality & healthy animals" with "the highest level of care." *See* https://www.ridglan.net/about/

24. Even Ridglan's corporate status with the State is in "delinquent" status since July 1, 2025.

25. In sum, Ridglan is a Puppy Mill - a commercial dog breeding facility that prioritizes profit over the health and welfare of the animals- that caused public concern for the beagles there.

**The March 15, 2026 Rescue**

26. On March 15, 2026, animal rescuers, concerned about the safety of the Ridglan dogs, entered the facility and removed 22 beagles.

27. An April 14, 2026 report from Sherstin Rosenberg, DVM, who evaluated those beagles by video on April 15 and reviewed their veterinarian records, found most of the dogs had interdigital dermatitis, skin infections, ten dogs of thirteen tested positive for Giardia, cage biting evidence in several dogs, one dog would have died if not saved, and unnecessary removal of dewclaws in many dogs, which is known to inflict unnecessary pain, among other serious health issues found in the rescued dogs. **Exhibit C**.

28. Notably this shows significant abuse of 22 dogs rescued from the some 2,000 that are there, which is a good extrapolation of the abuse occurring at Ridglan.

29.  The March 15, 2026 rescuers vowed to return to remove the rest of the nearly 2000 dogs remaining at Ridglan in an effort to save their lives from the horrific conditions there that has repeatedly been found by the state, the court, veterinarians and even whistleblowers testifying to the level of malevolence occurring there.

**30.** On April 6, 2026, in response to Ridglan's letter requesting assistance from its Congressman against the rescuers seeking to return. Congressman Marc Pocan responded that "the documented treatment of beagles on your property is alarming" and encouraged Ridglan to stop breeding dogs and rehome the dogs on the property. **Exhibit D.**

**The April 18, 2026 Demonstration**

31. On April 18, 2026, Plaintiffs were among some 1,000 rescuers who appeared at Ridglan to save some 2,000 beagles there. Plaintiffs had no intention to engage in violence and understood to remain non-violent and non-aggressive.

32. For over a month before the event, it was repeatedly announced on social media and mainstream media that the rescuers, including Plaintiffs, would not engage in violence.

**B. Pre-event planning by the Sheriff's Office**

33. Three days before the event, on April 15, Defendant Sheriff Barrett publicly stated that the Sheriff's Office would "use all available resources" to maintain peace and promised to protect everyone involved, including the rescuers. *See* https://www.danesheriff.com/PressDetail/11847

34. However, contrary to Defendant Barrett's statement to protect everyone, after the rescue event ended on April 18, 2026, that day Defendant Barrett issued another public statement admitting that he had "pre-planned a tiered response to resistance" and that persons officers believed had the "clear intent to break into the facility" were "first met with tear gas as a deterrent" and, if they "continued to escalate," were met with "less-lethal 40mm munitions and pepper balls."  Sheriff Barrett publicly defended that response as "appropriate and proportionate." *See* https://www.danecounty.gov/PressDetail/11856

35. Accordingly, there was absolutely no protection as he promised "to everyone" but a planned attack by Defendant Barrett and the other Defendants using chemicals, rubber bullets and bio-hazard manure trenches to inflict sever pain and possible death on the rescuers.

36. Upon information and belief, Defendant Barrett and Defendant Agard approved, authorized, or knowingly permitted the deployment of chemical agents and impact munitions in a manner that did not require individualized assessment of whether each person targeted posed an immediate threat.

37. Upon information and belief, the "tiered" force plan was created, approved, and operational before officers engaged with Plaintiffs, meaning an individualized assessment was not the goal of the planned attack upon Plaintiffs.

38. Upon information and belief, the plan contemplated the use of tear gas, pepper based chemical irritants, trenches filled with hazardous manure and projectile munitions against any person on the property.

**The Manure Trench and Hazard Created by Ridglan and Law Enforcement**

39. As if the chemical weapons and rubber bullets were not enough, one of the most dangerous weapons used were the manure filled trenches. Ridglan Farms and/or persons acting on its behalf deliberately constructed, maintained, or filled trenches with manure, sewage, and contaminated material around the facility knowing and intending that persons would be forced to step into them, fall into them, or make bodily contact with the sewage and biologically hazardous material.

40. Upon information and belief, Ridglan chose manure not merely as a physical barrier, but as a contamination weapon to foul Plaintiffs' bodies and clothing, to make decontamination impossible as it was outside in a field without products to remove the manure, to increase the pain and panic caused by pepper spray and tear gas, and to humiliate and punish the rescuers through forced contact with animal waste, knowing it can sicken and potentially cause death to the rescuers who were contaminated.

41. As stated above, the Ridglan dogs are known to suffer from parvo virus and giardia, which are two dangerous diseases. Parvo is a highly contagious, often fatal virus attacking the intestines and white blood cells of unvaccinated dogs, particularly puppies.  Giardia is a parasite found in feces-contaminated food, water, surfaces, or soil. It is highly contagious, often spreading through contaminated water (lakes, pools, streams) or direct contact with infected humans or animals. The CDC warns that manure pits or any contact with manure is highly dangerous, toxic and will cause sickness and death. https://stacks.cdc.gov/view/cdc/212638

42. Upon information and belief, the manure pits used at Ridglan were filled with feces of the dogs Ridglan keeps caged there and may have been also mixed with horse manure provided from local farmers.  No matter what animal feces it was filled with, it is illegal and life threatening.

43. Upon information and belief, the Defendants Agard, Barrett and Does 1-25 knew before using their chemical agents that Ridglan maintained manure filled trenches as part of their intent to seriously injure and cause death to the rescuers.

44. These Defendants knew that blinded or choking rescuers would predictably fall into those trenches or wipe their faces and eyes with manure contaminated hands, yet nonetheless proceeded to deploy pepper spray, tear gas, and impact munitions into and at Plaintiffs who were actually blinded and did fall into the manure pits.

45. The entire day of the event, the law enforcement Defendants allowed the illegal manure pits to remain as part of their scheme to weaponize even the trenches against Plaintiffs.

46. Defendants thereby intentionally and recklessly exposed Plaintiffs to hazardous biological contamination, including contact between manure smeared hands, skin, clothing, eyes, mouths, noses, and respiratory passages, while Plaintiffs were burning, blinded, disoriented, and struggling to breathe and subjected them to illness and potential death which there were some 1,000 other class-action plaintiffs that the majority of them fell into or crossed the manure pits and the future of their illnesses and potential deaths is on watch.

47. Upon information and belief, as part of their plan, Defendants instructed 911 not to provide medical assistance if rescuers called from Ridglan Farms as Defendants objective was to injure and cause permanent damage to the rescuers no matter their please for medical assistance as they were blinded, choked, burned , shot at and subjected to bacteria filled manure trenches.

48. Defendants' conduct created a substantial and unjustifiable risk of bodily injury, ocular injury, respiratory injury, skin irritation, infection, illness, and other grave harm, and amounted to reckless endangerment of human safety.

49. Indeed, Dane County's Chapter 49 manure ordinance states that its purpose is to provide for "proper and safe storage" and handling of manure and that improperly designed or maintained manure-storage facilities affect groundwater, surface waters, public health, plant life, animal life, and safety.

50. Ridglan's construction, alteration, and use of the manure trenches violated Dane County Code of Ordinances Chapter 49, including § 49.11(1)(a)1, because no person may construct or substantially alter a manure storage facility without first obtaining a permit, and § 49.16(1).

51. Ridglan's conduct further violated the Wisconsin manure-storage and runoff framework embodied in Wis. Stat. § 92.16, Wis. Admin. Code ATCP 50.56, Wis. Admin. Code NR

151.05(2)(a), and Wis. Admin. Code NR 151.06(2), all designed to prevent unsafe manure storage, leakage, runoff, and public health and water quality harm.

52. Only days later, on April 20, 2026, Ridglan Farms was merely cited for the manure filled trench as "constructing or altering a manure storage facility without a permit," by Dame County without an investigation or holding them accountable for proper clean-up and decontamination of the property to insure the soil and water runoff does not spread.

53.  Knowing this danger, Dane County has failed to follow-up and keep progress with the rescuers regarding their injuries suffered from the manure pits as, upon information and belief, many are suffering bacterial infections from the manure.

54. Dane County has also failed to make any public warning about the consequences of the manure trenches that Defendants Ridglan, Barret and Agard allowed people to come in contact with and the potential for a bacterial outbreak as the rescuers not only live in Wisconsin but in many other states and from Canada.

**Law Enforcement and Dane County Joint Action with Ridglan Farms**

55. Upon information and belief, Ridglan communicated and coordinated with law enforcement before April 18, 2026 regarding perimeter access control, barriers, and the anticipated response to demonstrators.

56. Upon information and belief, Ridglan's construction and use of the manure trench was not an isolated private act but part of a coordinated scheme implemented with the expectation that law enforcement would chemically and physically repel persons on Ridglan property into a contaminated and dangerous environment by using unwarranted force. **Exhibit E-** pictures of the manure trenches and chemical spraying and bombing on April 18, 2026.

**Plaintiffs' Experiences on April 18, 2026**

- **JOANNA BAIRD**

57. Plaintiff Joanna Baird is a 51year-old female and licensed Series 7 stock trader who resides in Utah. She attended the rescue event on April 19 in hopes to rescue the dogs after learning about the numerous criminal charges of animal abuse that Dane County allows Ridglan to avoid while the dogs remain there.

58. On April 18, 2026, at about 10 a.m., Baird arrived at Ridglan Farms and saw people walking on the grass towards the facilty. She did not see police or trespassing signs and did not hear anyone vocalizing warnings that there would be chemical and other physical force

8

used if she was on the property. As she approached the Ridglan property, there was a putrid and overwhelming smell of feces.

59. Ahead of her was a trench, then hale bales and then a fence about 25 feet away. As she crossed over the manure trench, she arrived at the fence where about three other rescuers were politely talking to about ten men on the other side who remained quiet and did not respond. The men were dressed in all black clothing; some had gas masks on and some held black machine type guns, while others stood there with their arms crossed. One man was bald and his head and neck were tattooed with jaguar type animals.

60. Baird asked the men if she could cross though a hole in the fence to speak with the men about the dogs abused at Ridglan. They refused to respond, so she proceeded to place her leg and arm through an opening in the fence when a very tall man dressed in black approached, pushed his knee into Baird's leg to restrain her and without any warning simultaneously sprayed tear gas directly into her face, mouth and eyes, that Baird describes as feeling felt like a bucket of liquid poured over her head.

61. Another rescuer pulled Baird back as she felt the liquid running down her neck, body and legs, and her face and clothes were completely orange from the spray.

62. Baird immediately started gagging and felt burning pain in her mouth. Within seconds it felt like her body was on lit on fire, especially her hands and face, and she was blinded and could not open her eyes.

63. Baird was terrified and did not know what happened. While screaming, blind and unable to breathe, she was certain that she was set on fire and burning alive to slowly die.

64. A rescuer named Nick carried her away, and she heard someone tell Nick to be careful of the manure trench that he had to cross while carrying Baird to get her to a medic that the rescuers organized on the other side of the manure trenches. He had no choice but to jump over the trench, but they fell in and were both covered in manure.

65. Nick continued racing Baird to a medic area that the rescuers set up because calls to 911 were ignored, despite rescuers violently attacked and seriously injured by Defendants' chemical warfare.

66. For four hours rescuers applied burn cream to Baird's face and hands and poured water into her eyes as she remained blind and in severe pain, with skin peeling off her face, choking,

9

foaming at the mouth and unable to breathe.  While there, Baird heard other people screaming in pain who were also violently attacked by defendants.

67. About five hours later, after leaving the Ridglan area, Baird tried to eat but that caused a severe reaction of vomiting and diarrhea for an hour, which caused her to go the ER She was tested and warned that she will have ongoing symptoms from the chemical attack used by Defendants.

68. Baird suffers the inability to eat or sleep because there is still burning in her throat and chest and she vomits if she tries to eat, suffers from triple vision, body aches, inability to use her left hand because the large man that pushed her caused her hand to twist, her hands were swollen, red and burning for three days, and showering caused the chemical caked in her hair to reactivate and violently choke her.  She presently has red spot on her chest that burns, itches and hurts to touch and her mouth is eternally dry and burns, with sores in her mouth and on her tongue. Plaintiff is traumatized from what Defendants did to her and has fear and anxiety.

- **Linda Gregersen**

69. Plaintiff Linda Gregersen is a 52 year old female who operates a pet sitting business.

70. When she arrived at Ridglan on April 18 in the morning, there were no police along the road where she parked, although there were some police cars there. Nor were there signs or verbal warnings at any time when she was on the property warning that chemical weapons and bacteria manure trenches would be used.

71. Like Plaintiff Baird, as she approached the property it had a putrid and overwhelming smell of feces.

72. When she arrived at the fence on the property, a few people stood there who were not yelling or aggressive in any way.  She saw on the other side of the fence men dressed all in black and had "contractor" printed on the back of their shirts. Some wore gas masks and had grey cans, like small propane cannisters, on their belts.  Some had black guns.

73. Gregersen was simply observing when she was pepper sprayed by being near Plaintiff Baird who was directly sprayed. Gregersen's throat and hands burned and her hands were orange. As she turned to leave the area, tear gas was thrown in her direction at least four times which the billowing smoke immediately stopped her from breathing, her eyes teared

and she was choking and gagging, gasping for air while her eyes and nose severely burned and her lungs felt like they were on fire - as if she inhaled glass.

74. She saw other rescuers gagging and collapsing from the tear gas, and as she observed about twenty rescuers at the medic area blinded, crying and screaming in pain. Then she saw about five more tear gas bombs thrown in her direction.

75. She believes there were about 200 law enforcement present, including state troopers with guns and batons.

**All Plaintiffs Were Non-Violent**

76. At all relevant times, Plaintiffs were visible, unarmed, and not attacking any person, nor did Plaintiffs ever strike officers, throw objects, or rush an officer in a manner creating an immediate threat of bodily harm.

77. Yet Plaintiffs encountered the manure trench and were exposed to manure, sewage or contaminated material from that trench, where their shoes, clothing, hands, or other body surfaces became contaminated with manure and foul material.

78. Defendants Does 1-25 sprayed pepper spray directly into Plaintiffs' eyes and face, or at such close range that the spray was a direct contact spray and deployed tear gas into areas where Plaintiffs were standing.

79. Plaintiffs were not given an adequate, realistic opportunity to retreat, decontaminate, or avoid further exposure once the chemical agents were deployed and 911 refused to appear.

80. The chemical agents caused immediate burning in Plaintiffs' eyes, face, nose, throat, skin, and respiratory passages, causing panic, choking, burning pain, blindness, disorientation, collapse and fear of infection for Plaintiffs and all those similarly situated.

81. Plaintiffs and all those similarly situated were forced to continue moving while partially blinded, contaminated, and in pain, which the exposure was aggravated by the fact that officers used chemical agents in a setting where they knew or should have known that a manure trench was placed in the path of persons on foot.

**Plaintiffs and the Class of Plaintiffs Injuries and Damages**

82. As a direct and proximate result of Defendants conduct, Plaintiffs and all those similarly situated suffered physical injury, including but not limited to burning eyes, facial pain, respiratory irritation, coughing, skin irritation, nausea, dizziness, temporary loss or blurring of vision, and contamination by animal waste.

83. Plaintiffs and all those similarly situated suffered fear of bacterial or pathogen exposure, humiliation, emotional distress, pain and suffering, and lingering trauma associated with the event.

84. Plaintiffs and all those similarly situated incurred or will incur medical expenses, medication costs, decontamination expenses, travel expenses, and other monetary losses.

85. The injuries to Plaintiffs and all those similarly situated were the foreseeable result of the combined use of chemical force and manure exposure as well as the physical violence and shooting at Plaintiffs with rubber bullets while disorienting them with chemical.

**County policy, custom, practice, and ratification**

86. Dane County, through its Sheriff, was the final policymaker for law-enforcement operations at Ridglan Farms in unincorporated Dane County.

87. The Sheriff publicly stated both before and after the event that the Sheriff's Office would deploy all available resources and that it had pre-planned a "tiered response" involving tear gas, 40mm munitions, and pepper balls.

88. Upon information and belief, officers on scene acted pursuant to those advance directives, operational plans, supervision decisions, and authorizations.

89. Upon information and belief, Dane County, for which Defendant Agard is responsible, and Defendant Barrett failed to train, supervise, and restrain deputies regarding the constitutional limits on using pepper spray, tear gas, and less-lethal projectiles against nonviolent persons who were not posing an immediate threat.

90. Upon information and belief, Dane County and Barrett also failed to require adequate individualized assessment before deploying chemical agents into a mixed crowd that included persons who were nonviolent and not threatening officers.

91. After the event, Defendant Barrett ratified the force used by characterizing it as appropriate and proportionate.

**CLASS ACTION ALLEGATIONS**

92. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a), Rule 23(b)(2), Rule 23(b)(3), and, in the alternative, Rule 23(c)(4), on behalf of themselves and the classes and subclasses defined below.

93. Plaintiffs seek certification of the following primary class:

<u>Chemical Force and Impact Munitions Class</u>: All persons who, on April 18, 2026, at or near Ridglan Farms in Blue Mounds, Wisconsin, were subjected by Dane County law-enforcement personnel, or by persons acting in concert with them, to tear gas, pepper spray, pepper balls, rubber bullets, 40mm less lethal munitions, or other chemical or impact projectiles as part of the pre-planned law enforcement operation at Ridglan Farms.

94. Plaintiffs also seek certification of the following subclasses:

<u>Manure Contamination Subclass</u>: All members of the Chemical Force and Impact Munitions Class who, during the same operation, had bodily contact with manure filled trenches, manure contaminated runoff, or manure smeared ground conditions while present on the Ridglan property.

<u>Physical Assault Subclass</u>: All members of the Chemical Force and Impact Munitions Class who, during the same operation, were also subjected by law enforcement personnel to direct hands-on physical force, including punches, kicks, stomping, takedowns, strikes, body slams, or similar physical assaults.

95. Excluded from the Class and Subclasses are Defendants, any parent, subsidiary, affiliate, officer, or employee of any Defendant, counsel for any party, judicial officers assigned to this matter, and their immediate families.

96. <u>Numerosity</u>: The members of the Class and Subclasses are so numerous that joinder of all members is impracticable, especially considering that there were some 1,500 persons present at Ridglan on April 18, 2026 who were subjected to Defendants common operation, including chemical agents and impact munitions, and that is sufficiently large to make class treatment the only fair and efficient method of adjudication.

97. <u>Commonality</u>:  Common questions of law and fact exist and are capable of class-wide resolution because the claims arise from the same coordinated event, the same location, the same time period, the same law enforcement operation, the same admitted pre-planned "tiered response," and the same common methods of force. These common questions include (i) whether Dane County and Defendant Barrett adopted, authorized, or ratified a common policy or operational plan to use chemical agents and impact munitions against nonviolent persons at Ridglan; (ii) whether the use of such force under those circumstances was objectively unreasonable; (iii) whether Dane County and Defendant Barrett maintained an unconstitutional policy, custom, or practice under Monell; (iv) whether Ridglan acted

jointly with law enforcement in creating or facilitating the dangerous conditions; and (v) whether the manure trench functioned as a common contamination hazard magnifying the effects of the chemical attack.

98. Typicality: Plaintiffs' claims are typical of the Class and Subclasses because Plaintiffs, like all class members, were subjected to the same overall course of conduct arising from the same operation and challenge the same common policy, command decisions, force tactics, and dangerous sewage conditions. Plaintiffs' claims arise from the same legal theories and depend in substantial part on the same common proof.

99. Adequacy: Plaintiffs and their counsel will fairly and adequately protect the interests of the Class and Subclasses. Plaintiffs have no interests antagonistic to those of absent class members and seek relief for injuries arising from the same common operation and the same unlawful use of force and contamination conditions. Plaintiffs are represented by Susan Chana Lask, an attorney with 37 years litigating civil rights cases, including police abuse and excessive force, and who served as Supreme Court counsel of record in *Florence v. Board of Chosen Freeholders of the County of Burlington*, 566 U.S. 318 (2012), a high-profile civil-rights class action challenging jail strip-search practices. Ms. Lask also published continuing legal education classes on Class Actions, Deposing Police Officers and she taught civil rights at Stanford Law School's Supreme Court clinic. She has also served as an expert consultant and counsel for the past 16 years in shutting down Puppy Mills nationwide and drafted animal rights laws at the request of Senators, Legislators and Mayors nationwide.

100. Rule 23(b)(2) certification is proper for declaratory and injunctive relief because Defendants acted on grounds generally applicable to the Class and Subclasses, making declaratory relief and corresponding injunctive relief appropriate for the entire Class. Fed. R. Civ. P. 23(b)(2).

101. Rule 23(b)(3) certification is proper for liability and damages issues arising from the Chemical Force and Impact Munitions Class and the Manure Contamination Subclass because the common questions identified above predominate over individual questions. The central liability issues will be proven through common evidence, including command decisions, operational planning, incident reports, body camera footage, use of force records, public admissions concerning the preplanned response, and evidence concerning

14

Ridglan's perimeter conditions. A class action is superior to hundreds of separate suits because it avoids duplicative litigation over the same common operation and the same common legal issues. Fed. R. Civ. P. 23(b)(3).

**COUNT I: 42 U.S.C. § 1983 – Excessive Force (Agard, Barrett and Does 1–25)**

102. Plaintiffs repeat and reallege all of the preceding paragraphs as if fully set forth here.

103. At all times during the April 18, 2026 event, Plaintiffs were not armed, never raised their voice, did not pose an immediate threat, and never intended to engage in violence, nor did they react violently or aggressively while Defendants violently attacked them.

104. The Fourth Amendment prohibits officers from using objectively unreasonable force.

105. Agard, Barrett and Defendant Does intentionally used force against Plaintiffs by deploying pepper spray directly into Plaintiff Baird's eyes and face and by repeatedly deploying tear gas at Plaintiff Gregresen, along with shooting at and using physical force against other rescuers in the area.

106. That force constituted a seizure or attempted seizure of Plaintiffs, was objectively unreasonable under the circumstances and was disproportionate to any legitimate law enforcement need as to Plaintiffs.

107. Barrett is individually liable because, upon information and belief, he personally authorized, directed, approved, supervised, or knowingly facilitated the force plan of chemical weapons, rubber bullets and the trenches filled with hazardous manure that was executed against Plaintiffs, and he later ratified it publicly.

108. Defendant Does are individually liable because they personally used the force or directly participated in the events that caused Plaintiffs' injuries.

109. As a direct and proximate result of this unconstitutional force, Plaintiffs suffered the injuries described above and their constitutional rights were violated.

**COUNT II: 42 U.S.C. § 1983 – Failure to Intervene (Barrett and Does 1–25)**

110. Plaintiffs repeat and reallege all of the preceding paragraphs as if fully set forth here.

111. Officers who have a realistic opportunity to prevent fellow officers from violating a person's constitutional rights but fail to intervene are liable under § 1983.

112. A realistic opportunity means a chance to warn the other officer using excessive force.

113. Defendant Does as officers and/or Barrett observed, knew of, or had reason to know that unconstitutional force was being used against Plaintiffs but failed to intervene.

15

114. Those Defendants had a realistic opportunity to prevent or halt the direct pepper spraying of Plaintiff Baird, the deployment of tear gas into Plaintiff Gregersen's immediate area, or further force once Plaintiffs were visibly impaired and nonthreatening.

115. Their failure to intervene was a direct and proximate cause of Plaintiffs' injuries.

### COUNT III: 42 U.S.C. § 1983 – Municipal Liability (Monell)
### (Agard and Barrett)

116. Plaintiffs repeat and reallege all of the preceding paragraphs as if fully set forth here.

117. A municipality is liable under § 1983 when a constitutional injury is caused by an official policy, a widespread practice, or the act of an official with final policymaking authority.

118. Defendant Agard as the county executive and Sheriff Barrett were the final policymakers for law enforcement operations at Ridglan Farms on April 18, 2026. Upon information and belief, Defendant Agard and the county board were aware of the pending rescue effort involving thousands of rescuers coming to her county, and she was informed of and approved Defendant Barrett's plan to use chemical weapons, manure trenches and rubber bullets as his plan to attacks the rescuers.

119. The use of force against Plaintiffs was caused by an official policy, decision, or command-level plan, including the pre-planned "tiered response" that contemplated tear gas, pepper-based projectiles, and 40mm munitions.

120. The use of force against Plaintiffs was caused by a widespread practice or custom of using chemical agents and less lethal projectiles without adequate individualized assessment in crowd control settings.

121. Defendants Agard and Barret failed to train and supervise deputies and officers adequately concerning the constitutional limits on using pepper spray, tear gas, and less-lethal munitions against nonviolent persons who do not pose an immediate threat and individualized assessments before using force.

122. As a direct and proximate result of Defendants Agard and Barrett's municipal policy and/or custom, Plaintiffs suffered the injuries described above.

### COUNT IV: 42 U.S.C. § 1983 –  Joint Action / Conspiracy to Deprive Civil Rights
### (Ridglan Farms, Agard, Barrett, and Does)

123. Plaintiffs repeat and reallege all of the preceding paragraphs as if fully set forth here.

124. Private parties act under color of state law when they are willful participants in joint action with the State or conspire with state actors to achieve an unconstitutional result.

16

125. Ridglan constructed and maintained the manure trench around its perimeter that it expected demonstrators would have to encounter.

126. Upon information and belief, Ridglan communicated and coordinated with Defendants Agard, Barrett and Does before April 18, 2026 regarding the trenches and expected demonstrator movement and these parties shared an understanding that force would be used to repel persons on the property.

127. Upon information and belief, the manure trench and the force plan were interdependent components as part of Defendants deterrence scheme, which the aim and foreseeable effect of that scheme was to expose persons, including nonviolent persons such as Plaintiffs, to chemical agents, contaminated material, pain, panic, impaired vision, and collapse.

128.  Ridglan was therefore a willful participant in a joint action with state actors.

129. Alternatively, Ridglan knowingly participated in a conspiracy with state actors to subject Plaintiffs to unreasonable force and dangerous contamination.

130. As a direct and proximate result of this joint action and/or conspiracy, Plaintiffs suffered the injuries described above.

### COUNT V:  Assault and Battery, Including Hazardous Biological Contact
#### (Ridglan, Agard, Barret, Does 1-25)

131. Plaintiffs repeat and reallege all of the preceding paragraphs as if fully set forth here.

132. By creating a manure filled contamination trench and using chemical agents and impact munitions in conjunction with that trench, Defendants intentionally placed Plaintiffs in reasonable apprehension of imminent harmful and offensive contact.

133. Plaintiffs reasonably feared being sprayed, struck, knocked down, forced into manure, contaminated, and injured.

134. Defendants also intentionally caused harmful and offensive bodily contact with Plaintiffs by weaponizing manure trenches that Plaintiffs would be forced into direct physical contact with and spraying chemical weapons in their faces and throwing tear gas cannisters exploding near them.

135. As a direct and proximate result of that battery, Plaintiffs suffered contamination, burning pain, fear of infection, physical injury, emotional distress, and other damages.

136. Plaintiffs repeat and reallege all of the preceding paragraphs as if fully set forth here.

137. Defendants' conduct caused Plaintiffs immediate fear, terror, and apprehension of bodily harm and did cause bodily harm.

**Count VI: Public Nuisance / Special Injury Against Ridglan Farms**

138. Plaintiffs repeat and reallege all of the preceding paragraphs as if fully set forth here.

139. Ridglan's manure filled trenches constituted an unreasonable and unlawful condition that interfered with public health, safety, sanitation, and bodily security.

140. The trenches exposed persons to animal waste, contamination and physical injury, and were maintained for the very purpose of fouling and deterring human movement, especially as Ridglan had their own private security called "contractors" pepper spraying and tear gassing Plaintiffs to blind and disorient them to fall into the manure trench.

141. Plaintiffs suffered special injuries different in kind from the public at large because they personally came into contact with the manure trenches, were contaminated by animal waste, and then subjected to chemical force and impact munitions while contaminated.

142. Ridglan is liable for damages and abatement under Wis. Stat. § 823.01.

**Count VIII: Negligence Grounded in Statutory and Ordinance Violations (Ridglan)**

143. Plaintiffs repeat and reallege all of the preceding paragraphs as if fully set forth here.

144. Ridglan owed Plaintiffs and the public a duty to refrain from creating an unreasonably dangerous manure storage and contamination condition and to comply with applicable manure storage, runoff, and public health requirements.

145. Ridglan breached that duty by constructing, maintaining, and using manure filled trenches without the required permit or certificate, by creating a condition that foreseeably caused direct human contact with manure and contaminated runoff, and by creating a condition that foreseeably magnified the injuries caused by chemical agents and impact munitions.

146. Ridglan's violations of Dane County Ordinance Chapter 49, Wis. Stat. § 92.16, Wis. Admin. Code ATCP 50.56, Wis. Admin. Code NR 151.05(2)(a), and Wis. Admin. Code NR 151.06(2) are *per se* evidence of negligence and of the dangerous and unlawful nature of the trench condition. Indeed, the County cited Ridglan for this later.

147. As a direct and proximate result of Ridglan's negligence, Plaintiffs suffered the injuries and damages alleged herein.

**Federal Environmental Preservation**

100. Upon information and belief, Ridglan's deliberate handling, storage, and disposal of manure in trenches created or contributed to an imminent and substantial endangerment to health or the environment within the meaning of 42 U.S.C. § 6972(a)(1)(B), and may have

involved ongoing releases or threatened releases of manure, leachate, or contaminated runoff implicating 33 U.S.C. § 1365 , involving continuing discharge to waters, drainage channels, or direct conduits to groundwater, requiring Ridglan to perform specific clean-up.

**PRAYER FOR RELIEF**

*WHEREFORE,* Plaintiffs demand judgment against Defendants as follows:

A. Compensatory damages in an amount to be determined at trial, including damages for physical injury, pain and suffering, emotional distress, humiliation, contamination, and loss of enjoyment of life;

B. Medical expenses, out-of-pocket expenses, lost income, and other economic losses according to proof;

C. Punitive damages as Ridglan's deliberate use of manure and the law enforcement Defendants' knowing use of chemical force in conjunction with that condition, demonstrated an intentional disregard of Plaintiffs' rights and safety sufficient to support punitive damages against the individual Defendants and against Ridglan Farms, Inc.;

D. A declaration pursuant to 28 U.S.C. § 2201 that Defendants' conduct violated Plaintiffs' constitutional and other legal rights;

E. Injunctive and abatement relief to the extent permitted by law, including such relief as is necessary to abate any continuing nuisance or dangerous contamination condition;

F. Reasonable attorneys' fees, costs, and disbursements under 42 U.S.C. § 1988 and other applicable law;

G. Prejudgment interest as permitted by law, and post-judgment interest as provided by 28 U.S.C. § 1961; and

H. Such other and further relief as the Court deems just and proper.

**JURY DEMAND-**Plaintiffs demand trial by jury on all issues so triable.

Dated: April 23, 2026

Respectfully submitted,
LAW OFFICES OF SUSAN CHANA LASK

/s/ Susan Chana Lask
Susan Chana Lask, Esq. (phv filed)
244 Fifth Avenue, Suite 2369
New York, NY 10001
917. 300-1958
susanchanalask@gmail.com

*Attorneys for Plaintiffs*